UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| LAS VIRGENES MUNICIPAL WATER DISTRICT-TRIUNFO SANITATION DISTRICT, a joint powers authority, | Case No:  C 14-01392 SBA |
| Plaintiff, | Related to Case No:  C 98-04825 SBA |
| v. | **ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| GINA McCARTHY, Administrator of the United States ENVIRONMENTAL PROTECTION AGENCY, and DOES 1-10, inclusive, | |
| Defendants, | |
| LOS ANGELES WATERKEEPER, HEAL THE BAY, and NATURAL RESOURCES DEFENSE COUNCIL, | |
| Intervenors. | |

In September 2013, in the United States District Court for the Central District of California, Plaintiff Las Virgenes Municipal Water District-Triunfo Sanitation District ("Plaintiff") brought the instant declaratory and injunctive relief action against Defendant Gina McCarthy ("Defendant"), Administrator of the United States Environmental Protection Agency (the "EPA").  Dkt. 1.  Plaintiff challenges the EPA's promulgation of the "Malibu Creek and Lagoon Total Maximum Daily Load for Sedimentation and Nutrients to Address Benthic Community Impairments" (the "2013 TMDL" or "Final TMDL"), which identifies the maximum quantities of nitrogen and phosphorous that Malibu Creek can receive without violating applicable water quality standards.

In March 2014, environmental groups Los Angeles Waterkeeper, Heal the Bay, and Natural Resources Defense Council (collectively "Intervenors") intervened.  Dkt. 14, 29. Thereafter, the United States District Court for the Central District of California transferred the action to this Court.  Dkt. 33.

Presently before the Court are cross-motions for summary judgment filed by Plaintiff, Defendant, and Intervenors.  Dkt. 65, 74, 75.  Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES Plaintiff's motion, and GRANTS Defendant and Intervenors' respective motions, for the reasons stated below.  The Court, in its discretion, finds this matter suitable for resolution without oral argument.  See Fed. R. Civ. Proc. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

I.      **BACKGROUND**

    A.      THE PARTIES

Defendant is the current Administrator of the EPA, a federal agency charged with the administration and enforcement of the Clean Water Act, in accordance with the specific delegations of authority from Congress contained in that statute.  Compl. ¶ 10, Dkt. 1.  On July 2, 2013, the EPA promulgated the Final TMDL that is the subject of this suit.  Id. ¶ 4.

Plaintiff owns and operates the Tapia Wastewater Reclamation Facility (the "Facility").  Compl. ¶ 5.  The Facility discharges highly treated effluent into Malibu Creek under a permit issued by the Los Angeles Regional Water Quality Control Board (the "LA Regional Board").  Id.  According to Plaintiff, the Regional Board will incorporate the strictures of the Final TMDL into the Facility's next permit, causing Plaintiff to incur an estimated $180 million in compliance costs.  Id. ¶ 6.

Intervenors are environmental groups whose members use and enjoy Malibu Creek. Mem. in Supp. of Mot. to Intervene at 1, Dkt. 15.

    B.      STATUTORY FRAMEWORK

The Clean Water Act (the "CWA" or the "Act") "anticipates a partnership between the States and the Federal Government, animated by a shared objective: 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'"

1  Arkansas v. Oklahoma, 503 U.S. 91, 101 (1992) (quoting 33 U.S.C. § 1251(a)).  In order to

2  attain this objective, the Act provides two methods for controlling water pollution: effluent

3  limitations and water quality standards.  Id.; see also City of Arcadia v. EPA, 411 F.3d

4  1103, 1105 (9th Cir. 2005).  Effluent limitations "restrict the quantities, rates, and

5  concentrations" of specific pollutants that may be discharged from point sources into

6  waterways.  Arkansas, 508 U.S. at 101 (citing 33 U.S.C. §§ 1311, 1314); see also 33 U.S.C.

7  § 1362(11).  Point sources are "any discernible, confined and discrete conveyance . . . from

8  which pollutants are or may be discharged," such as any pipe, ditch, channel, or tunnel.  33

9  U.S.C. § 1362(14).  "Water quality standards set the permissible level of pollution in a

10  specific body of water without direct regulation of the individual sources of pollution."

11  City of Arcadia, 411 F.3d at 1105.  "These standards supplement effluent limitations 'so

12  that numerous point sources, despite compliance with effluent limitations, may be further

13  regulated to prevent water quality from falling below acceptable levels.'  [Citation.]"

14  Arkansas, 508 U.S. at 101.

15       Once water quality standards are established, a State must identify "water quality

16  limited segments" or "WQLSs"--waters within its boundaries for which effluent limitations

17  are not sufficiently stringent to meet applicable standards.  33 U.S.C. § 1313(d)(1)(A); San

18  Francisco BayKeeper v. Whitman, 297 F.3d 877, 880 (9th Cir. 2002).  For each pollutant of

19  concern affecting a WQLS, i.e., each waterbody-pollutant pairing, the State must develop a

20  "total maximum daily load" ("TMDL").  33 U.S.C. § 1313(d)(1)(C); BayKeeper, 297 F.3d

21  at 880.  A TMDL is "the maximum quantity of a pollutant the water body can receive on a

22  daily basis without violating the water quality standard."  BayKeeper, 297 F.3d at 880.

23  "States may then institute whatever additional cleanup actions are necessary, which can

24  include further controls on point and nonpoint pollution sources."  Id.

25       Under the CWA, a State must submit WQLSs and TMDLs to the EPA for approval.

26  33 U.S.C. § 1313(d)(2).  The EPA must approve or disapprove a State's submission,

27  commonly referred to as a "303(d) list," within 30 days.  33 U.S.C. § 1313 (d)(2); City of

28  Arcadia, 411 F.3d at 1105.  If the EPA disapproves a State's 303(d) list, the EPA must

identify such WQLSs and establish such TMDLs as it deems necessary to implement applicable water quality standards.  33 U.S.C. § 1313(d)(2); City of Arcadia, 411 F.3d at 1105.  "The EPA is also under a mandatory duty to establish a TMDL when a State fails over a long period of time to submit a TMDL; this 'prolonged' failure can amount to the 'constructive submission' of an inadequate TMDL, thus triggering the EPA's duty to issue its own."  City of Arcadia, 411 F.3d at 1105-06 (quoting BayKeeper, 297 F.3d at 880-87).

### C.  THE HEAL THE BAY ACTION

By 1998, California had identified hundreds of waterbody-pollutant pairings requiring TMDLs in the Los Angeles Region.  AR 013054.  In December of that year, certain environmental groups--now Intervenors in the instant action--filed suit for declaratory and injunctive relief, alleging among other things that the EPA violated the CWA and the APA by failing to establish TMDLs for pairings under the jurisdiction of the LA Regional Board.  See Compl., Dkt.1, Heal the Bay v. McCarthy, No. C 98-4825 SBA ("Heal the Bay").[1]  The complaint alleged that, with respect to the Los Angeles Region, California had continually failed to submit TMDLs since June 26, 1979, when the first such submission had been due.  Id. ¶¶ 18-19.  The complaint further alleged that the EPA had a mandatory duty to disapprove California's constructive submission of no TMDLs and to itself promulgate the same.  Id. ¶ 20.

On March 23, 1999, the Court entered an Amended Consent Decree (the "Consent Decree") in which the EPA agreed to "ensure that a TMDL [would] be completed for each and every [listed] pairing of a WQLS and an associated pollutant in the Los Angeles Region."  Consent J. ¶ 3, Dkt. 25, Heal the Bay.  According to a schedule that concluded March 24, 2012, the Consent Decree set specific TMDL deadlines for the listed waterway-and-pollutant pairings.  Id.  For each pairing, the EPA was required to (a) approve a state-submitted TMDL by a specified date or, (b) establish a TMDL within one year of that date, unless California submitted and the EPA approved a TMDL within the one-year backstop

---

[1] The Court related the instant action to Heal the Bay.  See Dkt. 38.

period.  Id.  Upon entry of the Consent Decree, the Court closed the Heal the Bay action, but retained jurisdiction to construe, implement, modify, and enforce its terms.

As is pertinent here, the Consent Decree set a deadline of March 24, 2002 (or one year thereafter) for a TMDL addressing "nutrients (algae)" and "unnatural scum/foam" in Malibu Creek.  Consent J., Attach. 2-3, Dkt. 25, Heal the Bay.  On March 21, 2003, the EPA promulgated a TDML that set seasonal numeric targets for the pollutants nitrogen and phosphorous in Malibu Creek (i.e., the "2003 TMDL").  See AR 000028, 013069.  The LA Regional Board and EPA identified these nutrients as the pollutants primarily responsible for excessive algae and scum.  AR 013060-61.  In response to the 2003 TMDL, the LA Regional Board modified the permit for Plaintiff's Facility, implementing limitations upon the discharge of nitrogen and phosphorous.  Compl. ¶ 28.[2]

In 2008, upon the LA Regional Board's recommendation, California updated its 303(d) list to pair Malibu Creek and benthic-macroinvertebrate ("BMI") bioassessments.  AR 001309-16.  On April 12, 2010, the EPA notified interested parties that the Heal the Bay litigants had reached an agreement to modify the Consent Decree.  AR 001428-31.  In pertinent part, the notice proposed two new pairings for Malibu Creek--"[BMI] bioassessments" and "sedimentation/siltation"--for which TMDLs would be due by March 24, 2013.  AR 001430.[3]  On September 2, 2010, the Court entered an order approving a stipulation to modify the Consent Decree (the "Modification").  Stipulation to Modify Am. Consent Decree and Order, Dkt. 43, Heal the Bay.

On December 12, 2012, the EPA issued a public notice soliciting comment on a draft TMDL to address sedimentation and BMI impairment in Malibu Creek.  AR 001249.  The EPA provided notice of its intent to re-evaluate the 2003 TMDL and to "revise the total nitrogen and total phosphorus concentration based allocations."  Id.  On January 25, 2013, Plaintiff submitted a 9-page letter and 66 pages of "technical comments" regarding the draft

---

[2] The CWA requires a National Pollution Discharge Elimination System ("NPDES") permit for any point source discharge of a pollutant.  See 33 U.S.C. §§ 1311, 1342.

[3] By stipulation, the litigants subsequently extended the deadline to July 2, 2013.

TMDL.  AR 000423-96.[4]  The EPA reviewed and responded to all comments, and in some instances modified the Final TMDL.  AR 000834-957.  Thereafter, the EPA promulgated the 2013 TMDL that is the subject of this suit, setting revised seasonal numeric targets for nitrogen and phosphorus.  AR 000001-251.

In or about July 2013, the Consent Decree terminated by its own terms.  See Consent J. ¶ 39, Dkt. 25, Heal the Bay ("The Consent Decree shall terminate after fulfillment of all the obligations of EPA under the Consent Decree.")  In October 2013, the Heal the Bay litigants filed notice of the termination.  Notice of Termination of Am. Consent Decree, Dkt. 69, Heal the Bay.[5]

### D.    THE INSTANT ACTION

On September 19, 2013, Plaintiff filed the instant declaratory and injunctive relief action to obtain an order requiring Defendant to "withdraw and cancel" the 2013 TMDL. Compl. ¶ 3.  Specifically, Plaintiff alleges: (1) the EPA lacked authority to promulgate the 2013 TMDL; (2) the 2013 TMDL is an improper revision of the 2003 TMDL; (3) the EPA failed to allow sufficient public comment on the 2013 TMDL; (4) the 2013 TMDL constitutes an abuse of discretion because "no impairment was paired with Malibu Creek"; (5) the 2013 TMDL constitutes an abuse of discretion because it "does not prevent impairment of a beneficial use"; (6) the 2013 TMDL constitutes an abuse of discretion because natural nutrient sources "cannot be controlled"; (7) the 2013 TMDL constitutes an abuse of discretion because it uses "unhealthy [BMI] community" as an "'indicator' of an

---

[4] Additionally, in March 2013, Plaintiff filed a motion to intervene in the Heal the Bay action.  Pet. to Intervene, Dkt. 49, Heal the Bay.  Plaintiff argued that the newly proposed Malibu Creek TMDL "w[ould] directly affect the conditions imposed on [Plaintiff] in the NPDES permit process."  Id. at 14.  The Court denied Plaintiff's motion, reasoning, inter alia, that Plaintiff had an alternative means of protecting its interests, i.e., filing a separate action.  Order Den. Mot. to Intervene, Dkt. 72, Heal the Bay.

[5] In October 2014, Plaintiff filed a motion to dismiss the Heal the Bay action under Federal Rule of Civil Procedure 12(h)(3).  Mot. re Subject-Matter Jurisdiction, Dkt. 77, Heal the Bay.  The Court construed the motion as one to vacate the judgment under Rule 60(b)(4), and denied the same.  Order Den. Mot. Under Rule 12(h)(3), Dkt 85, Heal the Bay.  The Court found the motion moot because the Heal the Bay action was closed in 1999 and the Consent Decree terminated by its own terms in or about July 2013.  Id.  The Court further found that Plaintiff lacked standing to move to vacate the Consent Decree.  Id.

unhealthy creek system"; (8) the 2013 TMDL constitutes an abuse of discretion because it "fails to disclose any reason for making the protection of [BMI] a high priority"; and (9) the 2013 TMDL violates the CWA because "its purpose is to enhance Malibu Creek."

In April 2015, Plaintiff filed the instant motion for summary judgment.  In its summary judgment motion, Plaintiff argues: (1) the EPA lacked authority to promulgate the 2013 TMDL; (2) the 2013 TMDL is an improper revision of the 2003 TMDL; (3) the 2013 TMDL failed to address economic impact; (4) the 2013 TMDL is arbitrary and capricious because it (a) fails to quantify naturally occurring nitrogen and phosphorous, (b) promotes invasive species of BMI, and (c) utilizes an improper computer model to quantify BMI impairment; and (5) the EPA failed to allow sufficient public comment on the 2013 TMDL. Dkt. 65.[6]  After Plaintiff filed the instant motion for summary judgment, Defendant and Intervenors filed their respective cross-motions for summary judgment.  Dkt. 74, 75.

## II.   LEGAL STANDARD

"[S]ummary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'" Alabama v. North Carolina, 560 U.S. 330, 344 (2010) (quoting Fed. R. Civ. Proc. 56(c)). When reviewing final agency action, "there are no disputed facts that the district court must resolve."  Occidental Eng'g Co. v. INS, 753 F.2d 766, 769 (9th Cir. 1985).  Instead, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  Id.  In other words, the court decides whether the agency's action "passes muster under the appropriate APA standard of review."  Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agr., 499 F.3d 1108, 1115 (9th Cir. 2007).

---

[6] As demonstrated by the above recitation of Plaintiff's contentions, the allegations set forth in Plaintiff's complaint and the arguments raised in Plaintiff's summary judgment motion differ.  In its summary judgment motion, Plaintiff abandons certain causes of action alleged in its complaint, raises new arguments not alleged in its complaint, and modifies the bases underlying some of its claims.  As necessary, the Court will discuss the divergence between Plaintiff's pleading and moving papers.

Under the Administrative Procedure Act ("APA"), a reviewing court upholds an agency's substantive determination unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).  This deferential standard requires that an agency "'examine the relevant data and articulate a satisfactory explanation for its action.'"  FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).  Agency action is subject to reversal if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise."  Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.  Although the court's inquiry must be " 'searching and careful,' . . . 'the ultimate standard of review is a narrow one.'  [Citation.]"  Marsh v. Oregon Nat. Res. Council, 490 U.S. 360, 378 (1989)).

A reviewing court may also "hold unlawful and set aside agency action, findings, and conclusions" that are "without observance of procedure required by law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C), (D).  Unlike substantive challenges, "review of an agency's procedural compliance is exacting, yet limited."  Kern Cty. Farm Bureau v. Allen, 450 F.3d 1072, 1076 (9th Cir. 2006).  "We review de novo but are limited to ensuring that '"statutorily prescribed procedures have been followed."'  [Citations]."  Id.  "Further, we determine 'the adequacy of the agency's notice and comment procedure, without deferring to an agency's own opinion of the . . . opportunities it provided.'  [Citation.]"  Id.

## III.   DISCUSSION

### A.   MOTION TO STRIKE EXTRA-RECORD EVIDENCE

The EPA filed notice of lodging of the Administrative Record ("AR"), Dkt. 56, and notice of lodging of a Supplement to the Administrative Record ("AR Supp."), Dkt. 63.  When reviewing agency action under the APA, a court generally restricts its review to the administrative record.  Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv., 450 F.3d

930, 943 (9th Cir. 2006).  Although courts have recognized a few exceptions to this general

rule, the exceptions are "narrowly construed," and "the party seeking to admit extra-record

evidence initially bears the burden of demonstrating that a relevant exception applies."  San

Luis & Delta-Mendota Water Auth. v. Locke, 776 F.3d 971, 992-993 (9th Cir. 2014).

Plaintiff submitted three declarations in support of its motion for summary

judgment.  See Decl. of David W. Pedersen, Dkt. 66, Decl. of David Lippman, Dkt. 67, and

Decl. of Janice Dougall, Dkt. 68.  Plaintiff did not file a concomitant motion to augment the

administrative record.  Intervenors move to strike Plaintiff's extra-record evidence or, in the

alternative, for leave to submit responsive extra-record evidence.  Int.'s Mot. to Strike

Extra-Record Evidence, Dkt. 76.  Plaintiff filed a non-opposition to the motion, in which it

explicitly agrees "to withdraw the previously submitted declarations."  Pl.'s Reply to Ints.'

Mot. to Strike Decls. in Supp., Dkt. 80 at p. 2.  The Court deems the declarations so

withdrawn, and DENIES as MOOT Intervenors' motion to strike the same.

### B.   CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiff moves for summary judgment, arguing: (1) the EPA lacked authority to

promulgate the 2013 TMDL; (2) the EPA promulgated the 2013 TMDL without satisfying

a heightened standard for revising the 2003 TMDL; (3) the EPA failed to consider

economic impact in promulgating the 2013 TMDL; (4) the 2013 TMDL is arbitrary and

capricious in setting nitrogen and phosphorous limits; and (5) the EPA denied Plaintiff an

opportunity to examine and comment upon critical aspects of the 2013 TMDL.  Defendant

and Intervenors oppose Plaintiff's motion and move for summary judgment in turn.

### 1.   Authority to Promulgate

By way of its first cause of action, Plaintiff alleges that the EPA acted beyond the

scope of its statutory authority in promulgating both the 2003 and 2013 TMDLs.  Citing 33

U.S.C. § 1313(d)(2)(i), Plaintiff asserts that the EPA has authority to promulgate a TMDL

only if it first disapproves a TMDL submitted by the State or the State has clearly and

unambiguously decided not to submit any TMDLs for approval.  Compl. ¶ 36.  According

to Plaintiff, California did not wholly abdicate it's responsibility to promulgate TMDLs, as

evidenced by the State's submission of TMDLs addressing certain impaired waters.  Id.

¶ 37.  Plaintiff further asserts that the Heal the Bay Consent Decree was incapable of

conferring upon the EPA authority that the agency lacked under the CWA.  Id. ¶ 38.

In its motion for summary judgment, Plaintiff shifts focus to the Court's jurisdiction

to enter the Heal the Bay Consent Decree in the first instance.  Relying on Sierra Club v.

Whitman, 268 F.3d 898 (9th Cir. 2001), and San Francisco Baykeeper v. Whitman, 297

F.3d 877 (9th Cir. 2002), Plaintiff contends that the Court lacked jurisdiction to enter the

Consent Decree because there was no prerequisite waiver of sovereign immunity.  Plaintiff

does not set forth arguments in support of this contention, but rather "incorporates . . . by

reference  the points and authorities set forth in both the moving and reply papers submitted

in support of its Motion Under Federal Rules of Civil Procedure 12(h)(3) in the Heal the

Bay case."  Pl.'s Mot. for Summ. J. ("Pl.'s Mot.") at 5.  Plaintiff further argues that, even if

there had been a waiver of sovereign immunity in 1999, changed circumstances precluded a

finding of waiver for entry of the Modification in 2010.  Finally, Plaintiff argues that the

Modification proposing a TMDL for "[BMI] bioassessment" did not authorize the EPA to

promulgate a TMDL for nitrogen and phosphorous.

The Court is unpersuaded by Plaintiff's arguments.  As a threshold matter, Plaintiff

does not support its argument that this Court lacked subject matter jurisdiction in the Heal

the Bay action; instead, Plaintiff incorporates by reference points and authorities set forth in

its motion to dismiss the Heal the Bay action.  The Court is not obliged to consider such

arguments, which tend to circumvent the page limits set forth in the Civil Local Rules and

this Court's Civil Standing Orders.  See Swanson v. U.S. Forest Serv., 87 F.3d 339, 345

(9th Cir. 1996) (the Federal Rules of Civil Procedure do not sanction "the incorporation of

substantive material by reference"); see, e.g., Calence, LLC v. Dimension Data Holdings,

PLC, 222 F. App'x 563, 566 (9th Cir. 2007) (the district court did not abuse its discretion in

refusing to consider an argument that the plaintiff incorporated by reference from briefing

on a prior motion).  Nevertheless, the Court will briefly address Plaintiff's arguments

regarding subject matter jurisdiction.

"Suits against the EPA, as against any agency of the United States, are barred by sovereign immunity, unless there has been a specific waiver of that immunity."  Sierra Club, 268 F.3d at 901.  As is applicable here, Congress has waived immunity under 33 U.S.C. § 1365(a)(2) for "suits alleging a failure of the Administrator to perform a non-discretionary duty."  Id.  One such non-discretionary duty arises under the constructive submission doctrine, i.e., when a State's failure to submit a TMDL triggers the EPA's duty to promulgate the same.  BayKeeper, 297 F.3d at 881.  Here, Plaintiff argues that the EPA's duty to act was not in fact triggered, and thus, that no waiver of sovereign immunity occurred.  See Pl.'s Mot. at 6.  Plaintiff's understanding of subject matter jurisdiction is flawed, however, and its reliance on Sierra Club and BayKeeper is misplaced.

In Sierra Club, the plaintiffs filed suit against the EPA for failing to initiate an enforcement action.  268 F.3d at 900-01.  Because an enforcement decision is wholly discretionary, the Ninth Circuit affirmed the district court's dismissal for lack of jurisdiction.  Id.  Essentially, even if the allegations in Sierra Club proved meritorious, the plaintiffs in that case failed to allege a cause of action subject to judicial review under Section 1365(a)(2).  The claims in the Heal the Bay action are of a different variety.  The Heal the Bay plaintiffs filed suit against the EPA for failing to disapprove California's non-submission of certain TMDLs and for failing to establish such TMDLs in the state's stead.  If triggered, these duties are mandatory.  BayKeeper, 279 F.3d at 881.  Consequently, and regardless of whether the plaintiffs in the Heal the Bay action ultimately would have prevailed on their claims, Section 1365(a)(2) vested this Court with jurisdiction.  See Mata v. Lynch, 135 S. Ct. 2150, 2152 (2015) ("a court retains jurisdiction even if a litigant's request for relief lacks merit") (citing Steel Co. v. Citizens for Better Env't, 523 U.S. 83, 89-90 (1998) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction . . . .")).

Furthermore, contrary to Plaintiff's suggestion, BayKeeper does not render the claims in the Heal the Bay action untenable, or even implausible.  In BayKeeper, the plaintiffs alleged that the EPA had a mandatory duty to establish water pollution standards

for California because the State had failed to implement an adequate water quality control program.  BayKeeper, 297 F.3d at 879.  Noting that "California ha[d] submitted eighteen TMDLs and ha[d] established a schedule for completing its remaining TMDLs," the Ninth Circuit held that such action "preclude[d] any finding that the state ha[d] 'clearly and unambiguously' decided not to submit any TMDL[s]."  Id. at 883.  The Court therefore held that the constructive submission doctrine did not apply.  Id.

As a threshold matter, BayKeeper was decided in 2002, more than three years after this Court entered the Consent Decree in Heal the Bay.  In deciding BayKeeper, the Ninth Circuit made "no determination on California's past efforts and whether those efforts complied with the TMDL program."  297 F.3d at 883.  The Ninth Circuit explicitly stated, "Any declaration by this Court that EPA has been in violation of the CWA in the past would only serve as an advisory opinion because there is now no present controversy over past violations for which there is a remedy."  Id.  Consequently, BayKeeper did not serve to preclude application of the constructive submission doctrine in prior actions.

Moreover, BayKeeper concerned California's purported failure, and the EPA's purported duty, to promulgate TMDLs for the *entire state*.  See BayKeeper, 297 F.3d at 885 ("the EPA's duty under the CWA to establish TMDLs for *the State of California* has not been triggered") (emphasis added); see also Sierra Club v. McLerran, No. 11-CV-1759-BJR, 2015 WL 1188522, at *6 (W.D. Wash. Mar. 16, 2015) ("The issue in BayKeeper was whether California's failure to produce a significant number of TMDLs constituted a *programmatic* failure for the *entire* state.") (emphasis in original).  The Heal the Bay action, on the other hand, concerned California's failure, and the EPA's duty, to promulgate TMDLs for listed waterbody-pollutant pairings in the *Los Angeles Region*.  BayKeeper did not foreclose application of the constructive submission doctrine in actions, like Heal the Bay, challenging a *partial* failure on the part of the state.  See Sierra Club v. McLerran, 2015 WL 1188522, at * 6 (finding that BayKeeper does not "foreclos[e] the application of the constructive submission doctrine to a particular pollutant or waterbody segment") (citing Scott v. City of Hammond, 741 F.2d 992 (7th Cir. 1984) (holding that the EPA had

a nondiscretionary duty to promulgate a TMDL for Lake Michigan under the constructive submission doctrine)); see also Hayes v. Whitman, 264 F.3d 1017, 1023 (10th Cir. 2001) ("The constructive-submission theory turns on whether the state has determined not to submit a required TMDL for a given impaired waterbody.") [7]

Having found that the Court had subject matter jurisdiction to enter the Consent Decree, the Court easily disposes of Plaintiff's remaining arguments.  Once the Consent Decree was entered, the Court retained jurisdiction to implement, enforce, and modify the same.  See Jeff D. v. Kempthorne, 365 F.3d 844, 853 (9th Cir. 2004).  Such authority arose out of both the terms of the Consent Decree itself, see Consent J. ¶ 22, Dkt. 25, Heal the Bay ("The Court retains jurisdiction for the purposes of . . . issuing such further orders or directions as may be necessary or appropriate to construe, implement, modify or enforce the terms of this Consent Decree . . . ."), and the Court's "inherent authority to . . . modify [such] a decree," Nehmer v. U.S. Dep't of Veterans Affairs, 494 F.3d 846, 860 (9th Cir. 2007).  See also United States v. Swift & Co., 286 U.S. 106, 114 (1932) ("Power to modify the decree was reserved by its very terms . . . .  If the reservation had been omitted, power there still would be by force of principles inherent in the jurisdiction of the chancery.") The Court therefore had jurisdiction to enter the Modification.

Finally, the Court finds that the Modification authorized a TMDL addressing nitrogen and phosphorus, even though the Modification did not specifically list those nutrients.  California updated its 303(d) list to pair Malibu Creek and BMI bioassessments, AR 001309-16, and the Heal the Bay litigants sought to modify the Consent Decree to reflect the same.  Thereafter, the EPA set revised seasonal numeric targets for nitrogen and phosphorous, after determining that these nutrients cause the identified BMI impairment. AR 000001-251.  This approach is proper and permitted by the regulations implementing the CWA.  See 40 C.F.R. §§ 130.7 ("TMDLs may be established using a pollutant-by-

---

[7] Because the Court finds Plaintiff's arguments regarding subject matter jurisdiction in the Heal the Bay action unmeritorious, the Court declines to reach Defendant and Intervenors' alternative arguments regarding the EPA's independent authority to promulgate the Malibu Creek TMDLs in the absence of the Consent Decree.

1  pollutant or biomonitoring approach"); 130.25 (a)(2) (waterbodies are impaired if

2  "biological information indicates that they do not attain and maintain water quality

3  standards"); 130.21(a)(4) (a TMDL must be established for "the pollutant or pollutants

4  causing [an identified] impairment").  In view of the foregoing, the Court finds that the

5  EPA had authority to promulgate the 2013 TMDL.

6          Accordingly, as to the first cause of action, the Court DENIES summary judgment

7  for Plaintiff and GRANTS summary judgment for Defendant and Intervenors.

8                              **2.      Revision Standard**

9          By way of its second cause of action, Plaintiff alleges that the EPA violated the

10  CWA's provision regarding revised water quality standards.  Specifically, Plaintiff argues

11  that "[a] revised TMDL must meet higher standards," which the EPA failed to satisfy in

12  promulgating the 2013 TMDL.  Pl.'s Mot. at. 8.  According to Plaintiff, revision of a

13  TMDL is authorized only if the revising agency can show that the revision "'*will assure the*

14  *attainment* of [the applicable] water quality standard.'"  Id. (emphasis in original) (quoting

15  33 U.S.C. § 1313(d)(4)(A)).  Relying on this language, Plaintiff suggests that TMDLs are

16  not subject to revision unless the EPA can show with near certainty that a revised TMDL

17  will achieve applicable water quality standards.  Plaintiff asserts that the EPA has not

18  shown that the Final TMDL will assure attainment, and thus, that the TMDL is improper.

19          Pursuant to 33 U.S.C. § 1313(d)(4)(A), "where the applicable water quality standard

20  [for a WQLS] has not yet been attained, *any effluent limitation* based on a total maximum

21  daily load or other waste load allocation . . . *may be revised only if* (i) *the cumulative effect*

22  *of all such revised effluent limitations* based on such total maximum daily load or waste

23  load allocation *will assure the attainment* of such water quality standard, or (ii) the

24  designated use which is not being attained is removed in accordance with regulations

25  established under this section."  (Emphasis added).  "In the case of effluent limitations

26  established on the basis of section 1311(b)(1)(C) or section 1313(d) or (e) . . . , a permit

27  may not be renewed, reissued, or modified to contain effluent limitations which are less

28

1   stringent than the comparable effluent limitations in the previous permit except in

2   compliance with section 1313(d)(4) . . . ."  33 U.S.C. § 1342(o).

3          As persuasively argued by Defendant, Plaintiff's contention is fundamentally flawed

4   because section 1313(d)(4)(A) does not impose a heightened standard for promulgation of a

5   revised TMDL.  Rather, section 1313(d)(4)(A) permits the relaxation of water quality-

6   based effluent limitations provided that applicable water quality standards will still be

7   attained.  See Am. Iron & Steel Inst. v. EPA, 115 F.3d 979, 993, n.6 (D.C. Cir. 1997)

8   (noting that section 1313(d)(4) will in most cases allow permitting authorities to issue

9   relaxed permits that reflect new data) (citing Proposed Water Quality Guidance for the

10  Great Lakes System, 58 Fed. Reg. 20802-01 at 20837 (explaining that section 1313(d)(4)

11  provides "exceptions to the prohibition against relaxation of permit limits")).  With regard

12  to TMDL revisions, regulators may establish a revised TMDL (like an initial TMDL) "at a

13  level necessary to implement the applicable water quality standards."  33 U.S.C. § 1313

14  (d)(2)(C); see also AR 012004, EPA Guidance for Water Quality-Based Decisions: The

15  TMDL Process (1991) ("If follow-up monitoring indicates that water quality standards are

16  not or will not be met, a revised TMDL is required.").

17         Accordingly, as to the second cause of action, the Court DENIES summary

18  judgment for Plaintiff and GRANTS summary judgment for Defendant and Intervenors.

19                 **3.      Economic Impact**

20         Noting that California requires consideration of economic impact when establishing

21  water quality standards, see Cal. Water Code § 13241 (factors to be considered by a

22  regional board in establishing water quality objectives include "[e]conomic

23  considerations"), Plaintiff argues that the EPA erred in failing to consider compliance costs

24  when setting the 2013 TMDL's nitrogen and phosphorous limits.

25         Defendant correctly notes that Plaintiff has not pled a claim regarding the EPA's

26  failure to consider economic impact.  Summary judgment is available only on a claim

27  alleged in the complaint.  See Fed. R. Civ. Proc. 56(a) (the moving party must identify *each*

28  *claim* upon which it seeks summary judgment); Heathman v. Portfolio Recovery Assocs.,

1  LLC, No. 12-CV-201-IEG RBB, 2013 WL 755674, at *6 (S.D. Cal., Feb. 27, 2013)

2  ("Summary judgment is only available on claims or defenses (or parts thereof) actually

3  alleged.").  Consequently, this claim is not properly before the Court.  See Navajo Nation v.

4  U.S. Forest Serv., 535 F.3d 1058, 1080 (9th Cir. 2008) ("where, as here, the complaint does

5  not include the necessary factual allegations to state a claim, raising such claim in a

6  summary judgment motion is insufficient to present the claim to the district court").

7        Accordingly, as to Plaintiff's contention regarding the EPA's failure to consider

8  economic impact, the Court DENIES Plaintiff's motion for summary judgment.

9                    **4.    Abuse of Discretion**

10        By way of its fourth through eighth causes of action, Plaintiff alleges that the 2013

11  TDML constitutes an abuse of discretion.  Presently, in moving for summary judgment,

12  Plaintiff advances three arguments in support of its contention that the 2013 TMDL is

13  arbitrary and capricious.  First, Plaintiff argues that reductions in anthropogenic nitrogen

14  and phosphorous levels may be ineffectual in light of naturally occurring nitrogen and

15  phosphorous.  Second, Plaintiff argues that the 2013 TMDL promotes all BMI even though

16  one such species--the New Zealand mudsnail--is invasive.  Third, Plaintiff argues that the

17  EPA used an improper modeling methodology to conclude that BMI are impaired.

18        "The arbitrary and capricious standard is a deferential standard of review under

19  which the agency's action carries a presumption of regularity."  San Luis & Delta-Mendota

20  Water Auth., 776 F.3d at 994.  "This traditional deference to the agency is at its highest

21  where a court is reviewing an agency action that required a high level of technical

22  expertise."  Id. (citing Marsh, 490 U.S. at 377; Baltimore Gas & Elec. Co. v. Nat. Res. Def.

23  Council, Inc., 462 U.S. 87, 103 (1983) ("When examining this kind of scientific

24  determination . . . a reviewing court must generally be at its most deferential.").

25  Promulgation of a TMDL requires such technical expertise.  See Am. Farm Bureau Fed'n

26  v. EPA, 984 F. Supp. 2d 289, 318 (M.D. Pa. 2013), aff'd, 792 F.3d 281 (3d Cir. 2015).

27

28

### a.      Newly Advanced Theories

As a threshold matter, the Court notes that the arguments advanced in Plaintiff's motion for summary judgment do not correspond to the causes of action set forth in Plaintiff's complaint.  Although Plaintiff contends that the Final TMDL is arbitrary and capricious in both its complaint and its summary judgment motion, the *bases* for its claims vary.  Compare Compl. at ¶¶ 53-55 (failure to identify an "impairment"), ¶¶ 56-58 (failure to identify a "beneficial use"), ¶¶ 56-60 (inability to reduce nutrients due to naturally occurring sources), ¶¶ 61-64 (improper reliance on BMI as an "indicator" of water quality), and ¶¶ 65-67 (failure to justify prioritization of BMIs), with Pl.'s Mot. at 11-13 (inability to reduce nutrients due to naturally occurring sources), 13-15 (promotion of an invasive species), 15-18 (reliance on faulty modeling to compute levels of expected BMI). Generally, a party may not raise new theories for the first time on summary judgment.  See Pickern v. Pier 1 Imports (U.S.), Inc., 457 F.3d 963, 968-69 (9th Cir. 2006) (allegations in a complaint must give the defendant fair notice of what the plaintiff's claim is and the *grounds* upon which it rests).  Because Defendant and Intervenors attack Plaintiff's newly advanced theories on the merits, however, the Court will substantively address each of Plaintiff's new contentions.

### b.      Natural Nutrient Sources

The Malibu Creek Watershed drains an area of 109 square miles, and encompasses the somewhat unusual geology of the Monterey Formation--a natural composite of marine sediments.  AR 000019, 000191, 000039-40.  Drainage from the Monterey Formation contributes to elevated levels of minerals in Malibu Creek.  AR 000040, 000098-100.

Plaintiff argues that reducing anthropogenic nitrogen and phosphorous levels may fail to reduce algae levels in Malibu Creek in light of naturally occurring sources of the nutrients.  According to Plaintiff, without data quantifying background levels of nitrogen and phosphorous introduced by the Monterey Formation, "there is no certainty whether a reduction in algae will be achieved by the [2013] TMDL."  Pl.'s Mot. at 13.  Plaintiff contends that the 2013 TMDL is therefore arbitrary and capricious.

In promulgating the 2013 TMDL, the EPA undertook a thorough analysis of the Monterey Formation's impact on background nutrient levels, otherwise referred to as "nutrient reference conditions."  See AR 000085-100.  The EPA identified comparator reference sites situated inside and outside the Monterey Formation, and analyzed data points upstream and downstream of potentially significant nutrient sources along Malibu Creek.  Id.  Of particular note, Table 7-14 provides median nutrient concentrations for comparator sites and reference conditions for Malibu Creek.  AR 000100.  Based on such data, the EPA concluded that drainage from Monterey Formation "has little effect" on nitrogen levels, but "may result in somewhat elevated levels" of phosphorus.  AR 000099.  "[M]arkedly elevated" nutrient concentrations downstream of Plaintiff's Facility, however, indicated that the Monterey Formation "is not the primary cause" of elevated phosphates.  AR 000097.  Specifically, although average phosphate concentrations were elevated four-fold at sites draining the Monterey Formation, such concentrations were elevated twenty-fold at sites downstream of the Facility's discharge.  AR 000097-99.  Finally, in evaluating any link between elevated nutrient levels and BMI impairment, the EPA reasoned that BMI's likely adaptation to reference nutrient concentrations "argues against natural geology being a primary [stressor]."  AR 000207.

In view of the foregoing, Plaintiff's assertion that the EPA made "absolutely no effort" to quantify natural levels of nitrogen and phosphorous in Malibu Creek is simply specious.  See Pl.'s Mot. at 13.  The record confirms that the EPA made considerable efforts to quantify background levels of these nutrients, and used that data to "define the minimum level of nutrient enrichment that is attainable in the watershed."  AR 000098.  The EPA then reasonably concluded that natural geology is not the primary cause of nutrient loading or BMI impairment.  Nothing more is required.  See San Luis & Delta-Mendota Water Auth., 776 F.3d at 994 (courts sustain agency action if the agency articulated a rational connection between the facts found and the conclusions made).  Therefore, the Court finds that the 2013 TMDL is not arbitrary or capricious in its analysis of background nutrient levels.

1

#### c.  Invasive Species

2      In drafting the 2013 TMDL, the EPA identified a number of potential stressors that

3  could lead to degraded BMI assemblage.  AR 000175.  One such stressor is competition

4  from invasive species, particularly, the New Zealand mudsnail.  AR 000177-78.

5      Plaintiff argues that the 2013 TMDL promotes BMI "without distinguishing"

6  between those species that are "helpful to the environment" and those species, like the New

7  Zealand mudsnail, that "will damage it."  Pl.'s Mot. at 15.  According to Plaintiff, "[b]y

8  promoting [BMI] that would more properly be classed as pollutants, the 2013 TMDL is

9  arbitrary and capricious."  Id.

10      In promulgating the 2013 TMDL, the EPA recognized that the New Zealand

11  mudsnail is an invasive species, and that invasive species generally "impair native

12  ecosystems by outcompeting native species for resources such as food or habitat."

13  AR 000162, 000188.  After considering available studies and data, see AR 001877, 002052,

14  004326, including mudsnail density and total BMI richness and diversity, the EPA

15  concluded: "Overall, the evidence to date was inconsistent for indicating the New Zealand

16  mudsnails as a primary cause of biological impairment.  Although New Zealand mudsnails

17  are present and growing in abundance in the Malibu Creek Watershed, data were limited

18  and did not confirm negative interactions with the native [BMI]."  AR 000188.  Even so,

19  the EPA recommended "[f]urther monitoring and examination."  AR 000162.

20      Contrary to Plaintiff's assertion, the EPA did *not* appear "disinterested in [the

21  mudsnail] or its impact on the creek or on other [BMI]."  Pl.'s Mot. at 14.[8]  The EPA

22  evaluated available data, recommended further monitoring of the mudsnails, and rationally

23

---

24      [8] In support of the proposition that the EPA was "disinterested" in the mudsnail,
Plaintiff quotes the following portion of the 2013 TMDL: ". . . data are not available
25  describing their locations or abundances.  Therefore, no evaluation of their potential impact
on the [BMI] assemblage was performed."  Pl.'s Mot. at 14 (quoting AR 000188).
Plaintiff's selective quote is misleading.  The 2013 TMDL states, in full: "Although *other*
26  *invasive species* exist in the watershed (*e.g., red swamp crayfish, bullfrogs, and*
*mosquitofish*), data are not available describing *their* locations and abundances."  AR
27  000188 (emphasis added).  This language appears following the portion of the 2013 TMDL
that specifically addresses available data regarding the mudsnails and evaluates their impact
28  on native BMI.  The Court finds Plaintiff's misrepresentation of the record disconcerting.

---

implemented measures to address a *known* impairment--nutrient loading.  Again, no more is required.  See San Luis & Delta-Mendota Water Auth., 776 F.3d at 994.  The 2013 TMDL does not purport to "promote" the mudsnail, and Plaintiff fails to identify any evidence to support the assertion that the 2013 TMDL will affirmatively facilitate its expansion.  Furthermore, the Court finds that the EPA rationally took measures to protect native BMI species from chemical impairments, even if improving overall water quality will have the incidental effect of benefiting an invasive species.  If necessary, the EPA and/or the State may take other measures to address non-native species.  See Dioxin/Organochlorine Center v. Clarke, 57 F.3d 1517 (9th Cir. 1995) ("Nothing in the Clean Water Act requires TMDLs to be issued for all pollutants at once.").  Consequently, the Court finds nothing arbitrary or capricious about the 2013 TMDL's consideration of the invasive New Zealand mudsnail.

### d.    Improper Methodology

The EPA used two bioassessment modeling tools--the Southern California Index of Biotic Integrity ("SC-IBI") and the California Stream Condition Indicator ("CSCI")--to evaluate BMI community conditions in Malibu Creek.  AR 000106-08.  In preparing the draft TMDL, the EPA utilized only the SC-IBI model; at that time, the CSCI model was not yet available.  AR 000839-40.  During the comment period, certain commenters questioned the applicability of the SC-IBI model given Malibu Creek's somewhat unusual geology.  AR 000838.  The EPA determined that the SC-IBI model "is applicable as a bioassessment tool for this watershed."  AR 000107.  Nevertheless, in promulgating the Final TMDL, the EPA also utilized the CSCI model, which California had recently developed "to achieve statewide consistency and site-specificity" in bioassessments.  Id.  The CSCI model is similar to the SC-IBI model, but accounts for site-specific variability throughout the state, factoring in local watershed characteristics such as geology.  AR 000107, 000840.  The CSCI results confirmed the SC-IBI results, showing comparable levels of BMI impairment in Malibu Creek.  AR 000105-07, 000884 ("the results from these CSCI bioscores are comparable to the SC-IBI and demonstrate the impartment of [BMI] community in the Malibu Creek main stem and tributaries").

1    Plaintiff challenges the EPA's use of the CSCI model, arguing that the TMDL's

2   principal author, Dr. Cindy Lin ("Dr. Lin"), "did not claim expertise in computer

3   modeling," and that the 2013 TMDL "contained no foundation for the use of the CSCI

4   model."  Pl.'s Mot. at 16.  Plaintiff further asserts that the CSCI model, which is designed

5   for perennial streams, is the "wrong model" because Malibu Creek is ephemeral.  Id. at 17.

6   In light of these purported modeling flaws, Plaintiff contends that the 2013 TMDL lacks

7   competent evidence of BMI impairment.

8    "[A]dministrative agencies have undoubted power to use predictive models."  Small

9   Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 535 (D.C. Cir. 1983).  As

10   stated above, the deference afforded to an agency is "at its highest where a court is

11   reviewing an agency action that required a high level of technical expertise."  San Luis &

12   Delta-Mendota Water Auth., 776 F.3d at 994.  As part of this deference, courts afford

13   agencies "discretion to choose among scientific models," and "reject an agency's choice of

14   a scientific model only when the model bears no rational relationship to the characteristics

15   of the data to which it is applied."  Id. (internal quotations omitted).

16    Here, as a threshold matter, Defendant correctly notes that *Plaintiff's* first technical

17   comment on the draft TMDL was to *recommend* that the EPA use the CSCI for "all

18   calculations."  See AR 000432.  The EPA adopted that recommendation, and utilized both

19   the SC-IBI and the CSCI bioscores in the Final TMDL.  See AR 000839-40.  Plaintiff's

20   affirmative advocacy of the CSCI model during the comment period seemingly forecloses

21   its current challenge to the use of that model.  See S. Coast Air Quality Mgmt. Dist. v.

22   EPA, 472 F.3d 882, 892 (D.C. Cir. 2006) ("commenters may not reverse course after their

23   preferred approach is adopted by the agency").  In any event, Plaintiff fails to demonstrate

24   that the CSCI model was an unsuitable assessment tool in this action.

25

26

27

28

First, Dr. Lin's *personal* expertise in creating and selecting models is immaterial.[9] Agencies, like the EPA, are generally experts in their respective fields, and an agency's "choice of which . . . model produces the most reliable results falls within the agency's expertise." U.S. W. Commc'ns, Inc. v. Jennings, 304 F.3d 950, 959 (9th Cir. 2002).  Here, the EPA's decision to utilize the CSCI model appears reasonable given that California developed the model as "a primary tool to assess biological condition in the state." AR 000236.  With regard to application, Plaintiff acknowledges that "Dr. Lin can use a model," and fails to identify any particular flaws in her usage of the CSCI model.  Pl.'s Mot. at 16.  Plaintiff has therefore failed to demonstrate a lack of expertise.

Second, the administrative record provides ample foundation for the EPA's use of the CSCI model.  The Final TMDL thoroughly describes the development, methodology, and application of the model.  See AR 000107-08, 000120.  As the Final TMDL explains, the CSCI model uses a "predictive modeling approach" that compares observed BMI, which is the number of observed taxa at a site, and expected BMI, which is a function of physical habitat predictors.  AR 000107-08.  "The model can be applied to any site, and the differences between the expected and observed assemblages or metric scores indicate the site impairment."  Id.  The Final TMDL also includes a technical appendix dedicated to "CSCI Analyses," wherein the EPA detailed its efforts to ensure accurate bioscore results.  Appendix D, AR 000304-317.  As set forth therein, the EPA collaborated with the CSCI Science Team to calculate bioscores, evaluate the results, and ensure appropriate data interpretation.  AR 000305.  Thus, the EPA satisfied its duty to provide "a specific, detailed explanation of why its [bioassessment] models *do* yield reliable data."  Nw. Coal for Alternatives to Pesticides (NCAP) v. EPA, 544 F.3d 1043, 1049-50 (9th Cir. 2008).

Lastly, Plaintiff's contention that the EPA used the "wrong model" is wholly unsupported.  Plaintiff cites the administrative record for the proposition that Malibu Creek

---

[9] Dr. Lin did not author the CSCI model.  The "CSCI Science Team" that authored the model was comprised of experts from the Department of Fish and Wildlife, the Southern California Coastal Water Research Project, and the United States Geological Survey.  AR 000236.

is an ephemeral stream.  See Pl.'s Mot. at 17 (quoting AR 000840).  However, the record provides that "most of the watersheds" in "the Southern California regions" "are intermittent or ephemeral in nature."  AR 000840.  It does not describe *Malibu Creek*, in particular, as *ephemeral*.  In any event, even if the Court accepts Plaintiff's characterization of Malibu Creek, it does not follow that the CSCI model is inapt.  During the draft TMDL comment period, Plaintiff questioned whether bioassessment tools "developed for perennial wadeable streams" are appropriate for use in Malibu Creek.  AR 000461.  The EPA explained that the wadeable stream method--used to collect the data for both Malibu Creek and the CSCI model reference sites--is "applicable in wadeable streams and d[oes] not differentiate between non-perennial or perennial streams."  AR 000896; see also 000858.  In collaboration with the CSCI Science Team, the EPA also specifically calibrated the CSCI model for Malibu Creek.  See AR 000120, 000311.  Applying due deference, the Court finds that the EPA reasonably included the CSCI model in its bioassessment analysis.

### e.      Abandoned Causes of Action

As discussed above, the causes of action Plaintiff raised in its complaint and the arguments set forth in its motion for summary judgment diverge.  Defendant and Intervenors move for summary judgment on the claims Plaintiff failed to address in its motion, arguing that Plaintiff has abandoned the same.  Specifically, Plaintiff does not move for summary judgment on its fourth, fifth, seventh, eighth, or ninth causes of action.  Plaintiff does not oppose a grant of summary judgment in favor of Defendant and Intervenors with regard to these claims; nor does Plaintiff otherwise address the issue of abandonment in its responsive briefs.  The Court therefore deems the claims abandoned and waived.  See Desert Protective Council v. U.S. Dep't of the Interior, 927 F. Supp. 2d 949, 977 (S.D. Cal. 2013) aff'd, No. 13-55561, 2015 WL 7292969 (9th Cir. Nov. 19, 2015).[10]

---

[10] Plaintiff's ninth cause of action alleges that the 2013 TMDL is improper because its purpose is to enhance Malibu Creek.  Compl. ¶¶ 69-70.  Although this claim appears on its face to challenge the scope of the CWA's legal mandate, it essentially challenges the EPA's exercise of discretion in setting nitrogen and phosphorous limits.  Thus, the Court includes the ninth cause of action in its discussion of claims alleging an abuse of discretion.

#### f.      Conclusion

Accordingly, as to the fourth through ninth causes of action, the Court DENIES summary judgment for Plaintiff and GRANTS summary judgment for Defendant and Intervenors.

### 5.      Notice and Comment

By way of its third cause of action, Plaintiff alleges that the EPA "failed to allow comments on the entire TMDL that was promulgated." Compl. ¶ 47. Initially, Plaintiff alleged that the EPA denied Plaintiff the opportunity to examine and comment upon a report authored by Heal the Bay. In its motion for summary judgment, however, Plaintiff argues that the EPA denied Plaintiff the opportunity to examine and comment upon raw BMI data collected by Heal the Bay, as well as the CSCI model and input data files. Pl.'s Mot. at 19. Plaintiff asserts that, without access to the raw data, CSCI model, and input files, it was unable to test the EPA's data entry or the accuracy of the CSCI bioscores.

An agency is required to provide notice of its proposed rulemaking and an opportunity for interested persons to comment. 5 U.S.C. § 553.[11] "Integral to an agency's notice requirement is its duty to identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules." Kern Cty. Farm Bureau, 450 F.3d at 1076 (quotation omitted). "An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary." Id. (quotation omitted). "[W]ithout reopening the comment period," however, an agency "may use 'supplementary data, unavailable during the notice and comment period, that expands on and confirms information contained in the proposed rulemaking and addresses alleged deficiencies in the pre-existing data, so long as no prejudice is shown.'" Id.

---

[11] Defendant asserts, "A TMDL is an 'informal adjudication,' not a 'rule,' and as such does not require any particular notice and comment procedure." Def.'s Mot. at 23, n.12. Regardless of whether the APA requires notice and comment in this context, the EPA itself has adopted such procedures. See 40 C.F.R. § 130.7 (when identifying WQLSs and establishing TMDLs, "[t]he Regional Administrator shall promptly issue a public notice seeking comment on such listing and loadings").

Here, Plaintiff fails to show that procedural error occurred, or assuming such error, that prejudice resulted.  See Cal. Wilderness Coal. v. U.S. Dep't of Energy, 631 F.3d 1072, 1090 (9th Cir. 2011) ("[F]ailure to disclose information for public comment is subject to the rule of prejudicial error."); see also 5 U.S.C. § 706 (in reviewing agency action pursuant to the APA, "due account shall be taken of the rule of prejudicial error").  Regarding raw data, Plaintiff *now* acknowledges that it received the data directly from Heal the Bay.  Pl.'s Opp'n to Def.'s Mot. ("Pl.'s Opp'n") at 14, Dkt. 77 ("Plaintiff obtained raw data from Heal the Bay. . . ." (emphasis in original)).  Plaintiff even commented on Heal the Bay's raw data during the comment period.  See, e.g., AR 000463.  Thus, assuming the EPA erred in failing to provide the data, such failure "was harmless as to [Plaintiff] because [Plaintiff] had the [data] in [its] possession . . . ."  Cal. Communities Against Toxics v. EPA, 688 F.3d 989, 993 (9th Cir. 2012) (no harm is suffered "where a party has actual notice and was able to submit its views to the agency prior to the challenged action").[12]

Regarding the CSCI model and input files, only the *SC-IBI* model was available when the EPA authored the draft TMDL; thus, the Court finds that the EPA did not have cause to provide any *CSCI* documents for initial comment.  The Court further finds that the EPA did not err in failing to reopen the comment period after supplementing the Final TMDL with the CSCI bioscores.  See e.g., Bear Valley Mut. Water Co. v. Jewell, 790 F.3d 977, 993 (9th Cir. 2015) (holding that the agency did not err in supplementing a final rule with studies that "expand[ed] upon and confirm[ed] the data used to support . . . the [p]roposed [r]ule").  In the draft TMDL, "the SC-IBI results . . . show[ed] that the [BMI] community in Malibu Creek . . . is impaired."  AR 000135.  In the final TMDL, the CSCI results merely expanded upon and confirmed the SC-IBI results.  See AR 000107 (the SC-

---

[12] Plaintiff's motion for summary judgment asserted, "The raw data was withheld from Plaintiff."  Pl.'s Mot. at 20.  Additionally, Plaintiff made further assertions implying that *neither* the EPA *nor* Heal the Bay *ever* provided this data.  See id. at 20 ("Plaintiff immediately requested a copy of the raw data from Heal the Bay.  Heal the Bay declined to provide the data.")  Plaintiff now admits that it received the raw data from Heal the Bay, but insists that receipt of the data from any source other than the EPA is irrelevant.  Pl.'s Opp'n at 14.  Despite Plaintiff's effort to recast this argument, the Court finds Plaintiff's prior assertions to be disingenuous.

1   IBI results were "complemented by" the CSCI results); AR 000840 (the CSCI results
2   "confirm[ed] conclusions observed by the SC-IBI results"); AR 000844 (the EPA "included
3   the CSCI approach as a second line of evidence," which supported the "conclusion that the
4   benthic community is impaired").  Hence, reopening the comment period was unnecessary.

5       Finally, even if the EPA erred in failing to reopen the comment period, Plaintiff does
6   not demonstrate prejudice.  Plaintiff's alleged harm arises out of its inability to test the
7   EPA's data entry.  See Pl.'s Opp'n at 14.  Although disclosure of underlying data is
8   required in order to facilitate *meaningful* comment, this requirement is not so stringent as to
9   afford commenters the right to inspect *every facet* of the EPA's work, such as routine data
10  entry.  In any event, Plaintiff now has access to the data at issue, see AR Supp. 000919, but
11  fails to identify any errors.  See Cal. Wilderness Coal, 631 F.3d at 1090 (error is harmless if
12  it had no bearing on the procedure used or the substance of the decision reached).  This is
13  unsurprising, given that the CSCI Science Team "independently calculated a subset of the
14  bioscores," and consulted with the EPA to ensure accurate results.  AR 000120.

15      Accordingly, as to the third cause of action, the Court DENIES summary judgment
16  for Plaintiff and GRANTS summary judgment for Defendant and Intervenors.

17  **IV.   CONCLUSION**

18      For the reasons stated above, IT IS HEREBY ORDERED THAT:

19      1.   Intervenors' Motion to Strike Extra-Record Evidence, or alternatively, for
20  Leave to Submit Responsive Extra-Record Evidence, Dkt. 76, is DENIED as MOOT.

21      2.   Plaintiff's Motion for Summary Judgment, Dkt. 65, is DENIED.

22      3.   Defendant's Cross-Motion for Summary Judgment, Dkt. 74, is GRANTED.

23      4.   Intervenors' Cross-Motion for Summary Judgment, Dkt. 75, is GRANTED.

24      5.   The Clerk of the Court shall CLOSE this case.

25      IT IS SO ORDERED.

26  Dated:  2/1/16                         *Saundra B Armstrong*
27                                         SAUNDRA BROWN ARMSTRONG
                                           Senior United States District Judge
28